Louis J. L'Etourneau and Henry A. Harmon, Administrator of the Estate of Sarah L'Etourneau, Deceased, v. August Henquenet et al.[1]

*Will—Vested future estate—Contingent remainder—Mortgage of precedent estate.*

A testator devised to his wife, for and during her natural life, all of his real estate, which was particularly described in the will, and all that he might be seised of or possess at his decease, and all of his personal estate of every kind, with remainder over, after the determination of such life-estate, to his daughters Emily, Sarah, and Eleanor, to have and to hold the same to the said Emily, Sarah, and Eleanor, their heirs and assigns, forever. He made other dispositions of the remainder of other portions of his property; and by the eighth clause of his will he said:

"And whereas, one or more of my said children may not survive me or my said wife, I hereby order, direct, and devise the share of such devisee or devisees in such case to be equally divided amongst the remaining children herein named, and to their heirs, share and share alike."

And it is held:

1. That the will created a vested future estate in Sarah, Emily, and Eleanor. How. Stat. §§ 5523, 5525–5527.

2. That such future estate was contingent under the eighth clause of the will, and subject to be defeated by the death of Sarah, Emily, or Eleanor before the decease of the testator or of his wife.

3. As to such the precedent estates in remainder terminated on the

---

[1] Head-notes prepared by Champlin, C. J.

death of such child, and a contingent remainder was created in the surviving children and the heirs of any deceased child.

4. Such contingent remainder did not vest until the death of the wife.

5. By the statutes of Michigan, contingent estates are made to depend upon two conditions,—one is while the person to whom the estate is given remains uncertain, the other when the event upon which such estates are limited to take effect remains uncertain.

   *Held*, that the event upon which the estate was limited to take effect was uncertain, namely, the event of one or more children dying before the wife.

6. It is the event, and not the time, that controls in determining the question as to whether the remainder is contingent or vested.

7. Under the eighth clause the contingency depended upon the death of either one or more of the devisees before the death of the wife, and, such person being unknown until the event happened, the testator therefore made the contingency to happen, not on time of distribution, but the contingency was annexed to the gift itself, and therefore was a contingent, and not a vested, remainder.

8. Where there is a substituted devise, to take effect in case any of the class die during the precedent estate, the remainder is then vested in the existing members, subject to open to let in new members, and to be wholly divested in favor of the substituted devisee as to the share of the member dying.

9. Emily executed a mortgage, and died childless before her mother, the testator's wife.

   *Held*, that her estate under the will was subject to be defeated by her death before that of her mother, by which the estate then vested in her was cast upon her surviving brother and sisters, share and share alike; and of this the purchaser or mortgagee must take notice.

   *Held*, further, that the mortgagees have no claim upon Emily's share, which by the eighth clause passed to her brother and sisters, who, upon the mother's death, were seised in fee of the remainder, and entitled to the immediate possession of the lands devised.

Appeal from Wayne. (Reilly, J.) Argued October 15 and 16, 1891. Decided December 23, 1891.

Bill to construe a will and remove a cloud upon title.

Complainants appeal.    Decree reversed, and one entered in accordance with the majority opinion.    The facts are stated in the opinions.

*Eldredge & Spier*, for complainants.

*Edgar Weeks*, for defendant Henquenet.

*T. M. Crocker*, of counsel, for defendant Henquenet, contended:

1. The will should be so construed as to carry out the intentions of the man who made it. All instruments are understood with more clearness and certainty when the mind which is called upon to construe them knows the circumstances which called forth the words and phrases to be construed. Judge COOLEY, in delivering the opinion of the Court in *Eberts v. Eberts*, 42 Mich. 406, said: "We concede that the surrounding circumstances may be shown, and that sometimes they are very conclusive that the intent was different from what might be inferred from the language of the will interpreted without the aid of any extrinsic evidence." See, also, *Tuxbury v. French*, 41 Mich. 7.

2. The second clause in the will in question gave a life-estate in the property to the widow, and this was determined by her death, August 29, 1888.

3. On the part of defendant Henquenet, it is insisted that upon the death of the testator the title to the property devised under the third clause of the will vested in the widow, Clotilde, and the three daughters, Emily, Sarah, and Eleanor. There was a particular estate in the widow, Clotilde, to continue during her life, and the daughters were seised of the remainder immediately on the death of the father; their title was immediate, though the occupation and enjoyment were to be in the future. Before the death of the testator the title was perfect in him, and when he died that title was by the will immediately perfected in the widow and the three daughters in this case, as in *Wimple v. Fonda*, 2 Johns. 288, 289, where Judge Thompson, in delivering the opinion of the court, said: "The particular estate during life, and the remainder, are but one and the same estate in the law, the whole of which passed at once on the death of the testator, and the remainder-man was seised of his remainder at the same time the particular tenant was possessed of her estate. The possession of the particular tenant is the possession of the remainder-

man, so as to enable him to dispose of his estate by deed or will." This Court has at all times favored the vesting of estates; citing *Porter v. Porter*, 50 Mich. 456, 460; *Rood v. Hovey*, Id. 395.

4. The theory of the bill of complaint is that the two mortgages and the will executed by Mrs. Henquenet are without legal force or effect, and that they create a cloud upon the land in question. Complainants say, in effect, that the eighth paragraph of the will created a condition. Conditions are not favored in law when they defeat estates; citing *Calkins v. Smith*, 41 Mich. 409, 412. In *Rood v. Hovey*, 50 Mich. 399, Mr. Justice CAMPBELL, in delivering the opinion of the Court, said: "There can be no doubt that the policy of our statutes is to favor vested estates in preference to contingent, and that estates given to particular devisees shall always go their heirs unless a different purpose is apparent."

5. If the theory of the complainants in this case is correct, had Mrs. Paquette died before her mother, her children would have taken nothing by the will. Emily, Eleanor, and Sarah were each, at the time the father's will was made, young ladies of marriageable age. Had either married and had children, and then died while their mother still lived, the children so borne by them would have been disinherited by the will of their grandfather. Neither our statutes nor the decisions of this Court favor such construction of wills; citing *Rivenett v. Bourquin*, 53 Mich. 10, 14; *Letchworth's Appeal*, 30 Penn. St. 175; and rules of law must be vigorously applied when an attempt is made to disinherit heirs; citing *Graham v. Graham*, 34 Penn. St. 475.

*Edward E. Kane,* for defendants Duchaineau and the Congregation des Freres de la Charite.

*James J. Atkinson* and *William F. Atkinson,* for defendant DeBroux.

CHAMPLIN, C. J.   The bill is filed to remove a cloud upon title, and to obtain a construction of a will, which is quite fully set out in the opinion of my Brother MORSE.

But two questions are involved, and they relate to the construction to be given to the third and eighth clauses of the will:

*First.* Does the fee of the real estate devised by the third clause vest in the devisees therein named, upon the death of the testator?

*Second.* If it did vest under the third clause, was it subject to be divested under the eighth clause, in case of the death of either of the devisees before the termination of the precedent estate devised to the widow?

The answer to these questions must depend upon the intention of the testator, either as expressed or inferred or assumed, in accordance with the well-established canons of construction. The fundamental rule of construction is that the intention of the testator must be gathered from a consideration of the whole instrument together, giving to each part or clause due weight, as expressing some idea of the testator in the disposition of his property. The first and dominant idea of the testator, as manifested in this will, is that his wife, Clotilde, shall have a life-estate in possession of all of his property, real and personal, with remainder over to his children, as therein set forth. The time of enjoyment of the remainder was postponed until the death of his wife. Section 5523 of Howell's Statutes enacts that—

"Estates, as respects the time of their enjoyment, are divided into estates in possession and estates in expectancy."

Section 5525 enacts that—

"Estates in expectancy are divided into—

"1. Estates commencing at a future day, denominated 'future estates;' and

"2. Reversions."

Section 5526 defines a "future estate" as—

"An estate limited to commence in possession at a future day, either without the intervention of a precedent estate, or on the determination, by lapse of time or otherwise, of a precedent estate created at the same time."

Section 5527 provides that—

"When a future estate is dependent upon a precedent estate, it may be termed a 'remainder,' and may be created and transferred by that name."

We have here, then, under the third clause of this will, a vested future estate, within the very terms of the statute, devised to Sarah, Emily, and Eleanor.

The question now arises, was it the intention of the testator to make this vested future estate subject to be defeated by the contingency mentioned in the eighth clause? In the first place, it will be noticed that the *habendum* clause does not devise the estate absolutely to Sarah, Emily, and Eleanor, and their heirs and assigns forever, unqualifiedly, but adds this significant qualification: "After the determination of the life-estate aforesaid." He made no such qualification in the *habendum* to his devise to Josephine, nor in the *habendum* to his two sons, in the fifth clause. After disposing of the remainder to certain of his children named, excluding Margaret, the daughter of his deceased son, Charles, he then makes such remainder subject to the following contingency:

"And whereas, one or more of my said children may not survive me or my said wife, I hereby order, direct, and devise the share of such devisee or devisees in such case to be equally divided amongst the remaining children herein named, and to their heirs, share and share alike."

It is claimed that this clause is obscure, and open to two constructions. I do not so regard it. The testator was looking to the future. The question with him was, what provisions should be made with reference to these remainders in case either of his children named to whom he had devised the lands in remainder should die before he did, or before his wife, to whom he had granted the life-estate in possession? If such con-

tingency should happen, he devises the share of such devisee or devisees to the surviving children named, to whom the share or shares had been given, *and to their heirs*, share and share alike, The obvious sense and meaning is that "one or more of my children may die before my will can take effect by my death," and he provided for that contingency should it happen; and it also occurred to him that one or more might die before they could come into possession by the death of his wife; and in either case he provided what should be done with the share of such children named,—it should go to the heirs of any such deceased child, share and share alike. He disinherited no child of his children named as devisees. He did not intend that Margaret should, in any event, share in the "worldly effects" left by him. He gave explicit reasons for that, and provided that, if she should survive him, she should be paid $10 by his executors out of his personal estate. Can it be supposed that, after making this declaration of his intent not to have Margaret share in his estate, he, by the next clause, admitted her to a share in the devises he had given to his children in case one or more died before he or his wife died? It seems to me that such a construction would be a forced one, and quite contrary to the intention expressed.

Neither can I construe the language to mean that "my said wife may not survive me." This construction destroys the whole scheme of the will. The will can have no force unless there be an intermediate estate in his widow, and the legacies would all lapse. He did not intend that any of his property should be administered as intestate property. He disposed of the whole, and yet, to give this clause the construction contended for by the counsel for defendants, causes these shares

to be administered the same as intestate estates, and admits Margaret to share in the real estate, contrary to the will of the testator.

The remainder to his children was subject to the limitation of the eighth clause. The devise to his children created a vested estate, subject to be defeated by the subsequent contingency stated in the eighth clause. As to the shares of any child or children dying before the death of Clotilde, they became a contingent remainder to the surviving children, and the heirs of any deceased child, at the termination of the precedent estate of Clotilde. As to such the precedent estates in remainder terminated on the death of such child, and a contingent remainder was created in the surviving children and the heirs of any deceased child. Such contingent remainder could not vest until the death of Clotilde, for until then it could not be known who would be entitled to it as heirs or survivors. In the language of the statute, it was contingent while the person to whom it was limited to take effect remained uncertain.

By the statute, contingent estates are made to depend upon two conditions,—one is while the person to whom the estate is given remains uncertain, and the other when the event upon which such estates are limited to take effect remains uncertain. In this case the event upon which they are limited to take effect must be uncertain, for the reason that one or more of the children, if the contingency happened, must die before his wife, Clotilde, —events which must happen, if at all, within a certain time; and it is the event, and not the time, that controls in determining the question as to whether the remainder is contingent or vested. But they are contingent also while the person to whom they are limited to take effect remains uncertain, and that is the contin-

gency in this case; for it was not known, at the time the testator made his will, or at the time when he died, that Timothy and Eleanor and Emily would each die before his wife, Clotilde, should die. And by the eighth clause he made the contingency to happen, not upon the time of distribution, but the contingency was annexed to the gift itself, and in such cases they have been regarded as contingent, and not vested, remainders.

A vested estate, whether present or future, may be absolutely or defeasibly vested. In the latter case, it is said to be vested, subject to being divested on the happening of a contingency subsequent. Chapl. Suspen. § 57; *Manice v. Manice,* 43 N. Y. 303; *Howell v. Mills,* 7 Lans. 193; *Kelso v. Lorillard,* 85 N. Y. 177; *Baker v. McLeod's Estate,* 79 Wis. 534 (48 N. W. Rep. 657); *Burnham v. Burnham,* Id. 557 (48 N. W. Rep. 661). And where there is a substituted devise, to take effect in case any of the class die during the precedent estate, the remainder is then vested in the existing members, subject to open to let in new members, and to be wholly divested in favor of the substituted devisee as to the share of the member dying. Chapl. Suspen. § 59; *Smith v. Scholtz,* 68 N. Y. 41; *Baker v. Lorillard,* 4 Id. 257; *Du Bois v. Ray,* 35 Id. 162. In *Carmichael v. Carmichael,* 1 Abb. N. Y. App. 309, there was a devise to the testator's wife for life, and from and after her decease to the testator's children who might then be living. The court held that "the estate does not vest in remainder until her [the widow's] death, and then it vests only in those children who shall be living at the time of her death." See, also, *Hennessy v. Patterson,* 85 N. Y. 91.

It remains to be considered what effect shall be given to the mortgages executed by Emily upon the property described in the third clause of the will. These were executed after Eleanor's death, and purported to be upon the

undivided five-twelfths of the real estate described in the third clause of the will. Emily was at that time vested with the undivided third interest in remainder in the land. Timothy had died in 1861, leaving four of the six children at the time the mortgages were executed. Both Eleanor and Timothy died childless, without heirs. Emily evidently supposed that the one-third interest in the remainder of Eleanor was to be divided among the four surviving children, and she would on that basis be entitled to the undivided one-third of one-fourth, as she considered, equal to one-twelfth, which, together with her four-twelfths, would equal five-twelfths; and upon this share she executed the two mortgages set out in the bill. The property is said to be worth $25,000.

Section 5551, How. Stat., provides that "expectant estates are descendible, devisable, and alienable in the same manner as estates in possession." Contingent estates, although not vested, are within the provisions of the section; but when alienated, if they are defeasible, they are subject to the contingency by which they may be defeated. Emily's estate was subject to be defeated by her death before that of her mother, by which the estate then vested in her was cast upon her surviving brother and sisters, share and share alike; and of this the purchaser or mortgagee must take notice. She could not defeat the remainder from vesting in her brother and sisters upon the contingency of her death before she was entitled to come into the possession, for the statute, (How. Stat. § 5548) declares that—

"No expectant estate can be defeated or barred by any alienation or other act of the owner of the intermediate or precedent estate, nor by any destruction of such precedent estate by disseisin, forfeiture, surrender, merger, or otherwise."

Neither can these expectant estates of her brother and

sisters be defeated by the manner of dealing with the estate by the devisees of the testator. I find no evidence in the record that the devisees ever dealt upon the basis now contended for by defendants, who divide the estate into 54 shares, giving Emily 21 and Margaret 3 fifty-fourths; nor, in my opinion, does the will executed by Timothy lend any aid to defendant's counsel. That will was dated the 4th day of February, 1861. He died on the next day. His father was already dead. The will shows that he did not at that time suppose that he had any vested estate in the remainder left to him and his brother, Louis. This is the language he makes use of in disposing of his estate:

"*Second.* I give, grant, and devise all and every my interest, right, and estate, after the payment of said debts and expenses aforesaid, whether real or personal, and whether present or in remainder (being chiefly my interest and estate in the personal property and real estate left by my deceased father, Francis l'Etourneau, by his last will), to my sisters, Emily, Sarah, and Eleanor l'Etourneau, and to my sister, Josephine Paquette, and my brother, the Rev. Louis J. l'Etourneau, equally, to be divided between them, share and share alike; subject, nevertheless, to and under the limitation hereinafter mentioned:

"1. In case of the death of my said sister, Mrs. Josephine Paquette, and of the heirs of her body, before said estate so left by my father in remainder shall become vested, I direct that her share shall descend, and hereby devise her share of said estate, to my surviving brother and sisters equally, to be divided amongst such survivors, share and share alike.

"2. In case of the death of either of my said sisters or brother before said estate so as aforesaid devised by me shall become vested in them, I direct and devise that the share of said deceased sister or brother go to the survivor or survivors equally, to be divided share and share alike."

It is apparent that he did not regard the remainder left by his father as yet having vested in him, and it

will be further noted that he gives the property in the same manner and to the same persons mentioned in the eighth clause of his father's will. He provides for the contingency of either of his sisters or brother dying before the estate given by himself becomes vested in them, and directs that such share shall be equally divided between the survivors, share and share alike; thus treating his estate as a contingent remainder, and not to vest in his devisees until the death of his mother. Emily made her will May 2, 1868, she only assuming to devise "such property, either real or personal, as I have or may hereafter during my life inherit at any time." This will throws no light upon the construction to be placed upon that executed by her father. Moreover, I consider it would be an unsafe doctrine, to hold that the intention of a testator should be ascertained from the claims made by devisees who are anxious to obtain the property which they think they are entitled to under their construction of the will.

In my opinion, the mortgagees have no claim upon Emily's share, which by the eighth clause passed to the surviving brother and sisters. Whether the eighth clause constituted a contingent remainder or not, in such as should take under it, it can make no difference in the result in this case, because Emily having died without heirs, before the death of her mother, her interests and estate, whether vested or contingent, were defeated, and passed to the surviving children, and the heirs of any deceased children, who upon Clotilde's death became seised in fee of the remainder, and entitled to the immediate possession of the lands devised.

It is my opinion that the decree of the circuit court is erroneous, and should be reversed, and a decree entered herein in accordance with these views.

McGRATH and LONG, JJ., concurred with CHAMPLIN, C. J.

MORSE, J. (*dissenting*). Francis l'Etourneau died August 26, 1860, leaving a last will and testament. After providing that his debts, funeral and other proper expenses be paid out of his personal property, he devised his estate as follows:

"*Second.* I give, grant, devise, and bequeath unto my beloved wife, Clotilde l'Etourneau, as a testimony of my great love for and confidence in her, for and during her natural life, all and every my real estate, which is hereinafter more particularly described in the devises following, and all that I may be seised of or possess at my decease, and all and every my personal estate, whether in money, goods, chattels, bonds, obligations, or choses in action; to have and to hold the said real estate and its appurtenances to her, the said Clotilde l'Etourneau, for and during the full term of her natural life, with remainder over as hereinafter set forth; the said personal property to be under her absolute control, to sell and dispose of as she may deem fit or desire; and I desire and request my beloved wife, so far as may be in her power, to keep our children and family together as heretofore.

"*Third.* After the determination of the aforesaid life-estate of my wife, Clotilde, I give, grant, and devise unto my daughters, Emily, Sarah, and Eleanor l'Etourneau, all that certain tract and parcel of land situate, lying, and being in the city of Detroit, in the State of Michigan, known as the 'Western Hotel Property,' and described as follows, to wit: Lots twenty-one and twenty-two, in block five, fronting on Woodbridge street, on the Cass front, reference being had to the recorded plat thereof, surveyed by John Mullet; together with all and singular the hereditaments and appurtenances, rents, issues, and profits thereof; to have and to hold the same to the said Sarah, Emily, and Eleanor, their heirs and assigns, forever, after the determination of the life-estate aforesaid.

"*Fourth.* After the determination of the life-estate of my wife, Clotilde, as aforesaid, I give, grant, and devise unto my married daughter, Josephine Paquette, all that certain piece and parcel of land situate, lying,

and being in the county of Macomb and State of
Michigan, lying on the river Clinton, and bounded as
follows: In front by the said river; on the east by
lands formerly belonging to Etienne Dulac and Joseph
Campau; on the south-west by lands formerly belonging
to Batist Peltier; and on the rear by lands formerly
belonging to Batist Thomas, Jr.; and containing seventy-
two and a half acres, more or less,—the same being a
part of the tract granted by the United States by patent
dated 7th October, A. D. 1811, to Louis Petet, and by
said Louis Petet and wife conveyed to me; together
with all and singular the hereditaments and appurten-
ances thereunto belonging; to have and to hold the
same to the said Josephine Paquette, and to the heirs
of her body begotten, with remainder over to her or
their heirs.

"*Fifth.* After the determination of the aforesaid life-
estate devised to my wife, Clotilde, I give, grant, and
devise unto my sons, the Reverend Louis Job l'Etour-
neau and Timothy E. l'Etourneau, all and every those
tracts and parcels of land hereinafter described, viz.:
My present homestead, situate and being in the village
of Mt. Clemens, in Macomb county and State of
Michigan, being lots in James Williams' addition to said
village, and numbered, according to a survey and plat
thereof by J. Wesalowski, as Nos. three, four, five, six,
seven, eight, nine, ten, eleven, twelve, thirteen, four-
teen, fifteen, sixteen, seventeen, eighteen, nineteen,
twenty, twenty-one, twenty-two, twenty-three, and
twenty-four, being the same conveyed by James Williams
and wife to me; and also those lots in the city of
Detroit (formerly in the town of Hamtramck, in the
county of Wayne, Michigan) known and described as
lots numbers thirteen and fourteen, in block number
seven, in the subdivision of the 'Witherell Farm,' so
called, or private claim number ninety, according to the
survey and plat thereof made by A. E. Hattion, and
duly recorded; together with all and singular the
hereditaments and appurtenances thereunto belonging; to
have and to hold the same unto the said Rev. Louis J.
l'Etourneau and the said Timothy E. l'Etourneau, their
heirs and assigns forever.

"*Sixth.* After the death of my beloved wife, I give,
grant, and bequeath unto each and every of my children
above mentioned, and to their heirs and assigns, all my

personal property and estate, if any there be then remaining, equally to be divided amongst them, share and share alike; and for the amicable arrangement of the said division, without expense, I give and grant unto my surviving executor, or such person as may be properly appointed to complete the trusts of this will, full power and authority to sell and dispose of the same for the best price, and to divide the proceeds amongst my said children, ·or their heirs, equally as aforesaid, unless they. shall agree amongst themselves to such division.

"*Seventh.* I do here remember my granddaughter, Margaret, the child of my late son, Charles R. l'Etourneau, and believing that in his life-time I had given to her father, of whom she is sole heir, his full share of my worldly effects, I hereby bequeath to the said Margaret, if she shall survive me, the sum of ten dollars, to be paid to her by my executors out of my personal estate.

"*Eighth.* And whereas, one or more of my said children may not survive me or my said wife, I hereby order, direct, and devise the share of such devisee or devisees. in such case to be equally divided amongst the remaining children herein named, and to their heirs, share and share alike."

His wife and his son Louis were made executors, with full power to the survivor of them.

There survived the said Francis l'Etourneau, his wife, Clotilde l'Etourneau, and the following children named in said will: Louis J. l'Etourneau, Timothy E. l'Etourneau, Emily, Eleanor, and Sarah l'Etourneau, and Josephine Paquette. On the 5th of February, 1861, Timothy E., one of the sons and devisees named, died at Mt. Clemens, testate. On the 13th day of May, 1862, Eleanor, one of the daughters and devisees named, died at Mt. Clemens, intestate, unmarried, and without issue. The daughter Emily married the defendant August Henquenet, and died testate, at Mt. Clemens, on the 15th day of October, 1887. John Otto was appointed administrator of her estate with the will annexed. At the death of Mrs. Clotilde l'Etourneau, on the 29th day of August, 1888, there survived of the children and devisees:

named in the will of Francis l'Etourneau, deceased, the
following: Louis J. l'Etourneau and Sarah l'Etourneau
and Mrs. Josephine Paquette. On the 16th day of Octo-
ber, 1868, Sarah l'Etourneau was adjudged incompetent
by the probate court of Macomb county, and Louis J.
l'Etourneau was appointed her guardian, and qualified as
such.

The complainants, Louis J. P. l'Etourneau and Sarah
l'Etourneau, by her guardian, filed this bill of com-
plaint in the circuit court for the county of Wayne, in
chancery, December 6, 1888, praying that the court
might determine their interests in the property mentioned
in the third clause of the will, known as the " Western Hotel
Property," and described as lots numbers 21 and 22, in block
3, facing on Woodbridge street, on the Cass front, refer-
ence being had to the recorded plat thereof, surveyed by
John Mullet. August Henquenet is made a defendant
because he claims a life-estate in five-twelfths of the
premises under the will of his wife, Emily. Francis J.
de Broux is the holder of a mortgage upon five-twelfths
of the property, executed February 3, 1872, by Emily
Henquenet and her husband to William C. Groesbeck
for $2,000, and assigned by him to Charles Ryckært,
January 4, 1881, and by Ryckært to De Broux, July 16,
1888. January 15, 1885, Emily Henquenet executed
another mortgage on five-twelfths of the same premises
for $5,000 to De Broux. This was assigned July 8,
1885, to Joseph F. de Poorter, who subsequently died
testate. Defendant Duchaineau is executor of his will,
and the Congregation des Freres de la Charite, a foreign
corporation, claims under the will of De Poorter an
interest in this mortgage. At the time of the filing of
this bill the mortgage had been foreclosed by advertise-
ment, and bid in by De Broux. Josephine Paquette, a
daughter of Francis l'Etourneau, after the death of

Eleanor, claimed a one-twelfth interest in the property, and conveyed the same, September 2, 1884, before the death of her mother, to one Morton. By mesne conveyances it passed from Morton to one Horace Brewer. Upon Brewer's death it descended to Charles J. Brewer, who died leaving two minor children, Florence and Horace R. Brewer, who, with their father's administrator, are made defendants.

The complainants claim that, under the eighth clause of the will, Eleanor and Emily, who died before their mother, never had any vested interest in this property, and that one-third of it at the mother's decease became vested in Sarah, and the other two-thirds in equal shares in Louis, Sarah, and Josephine, dividing the title as follows: Five-ninths in Sarah, and two-ninths each in Louis and Josephine. Josephine seems now to be interested in this construction of the will, although, in the disposition of the property willed to her, she has heretofore, as have all the family, acted upon the supposition that the contention of the defendants was the correct one in the interpretation of her father's will. The defendants' contention is that, upon the death of Francis l'Etourneau, Emily, Sarah, and Eleanor, who were all then living, were vested each with an equal undivided share,—three-ninths,—subject only to the life-estate of their mother. Eleanor dying without issue, and intestate, her three-ninths of the premises descended in equal shares to her mother, Louis, Sarah, Emily, and Josephine, and the granddaughter, Margaret, leaving the title distributed as follows: Emily and Sarah each 21-54, and Josephine, Louis, and Margaret each 3-54, subject to the life-estate of the mother; and the mother 3-54, and her life-estate in the whole. It was under this idea of the condition of the title that Emily executed the two mortgages, and Josephine deeded to Morton.

Timothy died less than six months after the decease of his father. He made a will, February 4, 1861, the day before his death, by which he devised all his property, "whether present or in remainder (being chiefly my interest and estate in the personal property and real estate left by my deceased father, Francis l'Etourneau, by his last will"), to his sisters, Emily, Sarah, Eleanor, and Josephine, and his brother, Louis, share and share alike; providing that, in case of the death of his sister Josephine, and of the heirs of her body, "before said estate so left by my father in remainder shall become vested," her share shall descend in equal parts to the surviving sisters and brother; and that, "in case of the death of either of my said sisters or brother before said estate so as aforesaid devised by me shall become vested in them," the share of said deceased sister or brother shall descend equally to the survivor or survivors. The property willed to Timothy by his father was devised in equal shares to Louis and Timothy. The homestead has never been conveyed, but the Detroit or Hamtramck property was sold. The first deed of lot 14 was a warranty deed, signed by Louis alone. Afterwards it would appear that some of the family, if not all of them, joined with him in the conveyance, and mortgages were taken back on the land. The mortgage on lot 14 ran to Louis and his mother, and the one on 13 to Louis, Sarah, Emily, and their mother. Louis says he received $750 of this property, which was a part of the money received for the lots. These lots were sold between 1869 and 1873. The will of Timothy was proved and admitted to probate. It does not appear that he had any other property than that willed to him by his father. If the contention of the complainants is correct, he had nothing to will away. When Timothy died, Sarah, Eleanor, Louis, Josephine, and Emily were living; and there is

evidence tending to show that Louis recognized the fact that Emily had an interest in the homestead, as devisee of Timothy, and proposed to trade his one-twelfth interest in the Woodbridge-street property, as heir of Eleanor, for Emily's interest in the homestead. Louis testified that, after the death of Timothy, the Hamtramck property was treated as the property of the family.

Josephine sold the farm willed to her by her father, August 10, 1886. None of the family, except her mother, joined in the deed, and she had the whole proceeds of such sale. Her children also conveyed their interests. Immediately after the death of her father, she took possession of this farm, and it was always treated as her property, subject only to the life-estate of her mother and the remainder over to her children, and she and her husband made valuable improvements upon it.

Emily in her life-time, being the eldest member of the family at home, assisted her mother in the management of the property, and it seems to have been her idea, as well as her mother's, that the several devises in her father's will vested upon his death. Acting upon this idea, she executed the two mortgages upon her portion. She also made a will, dated May 2, 1868, in which she devised all her estate, which she had inherited or might inherit, to her husband during his life, with remainder over to her brother, Louis, and her sisters, Sarah and Josephine, and their heirs, and all her property not acquired by inheritance, absolutely to her husband and his heirs. She named her brother, Louis, as her execu_ tor. Under the same impression Josephine disposed of her property, and deeded an interest in the Woodbridge-street property to Morton, which interest is now held by the minor children of Charles J. Brewer. It is also evident that Louis had the same understanding of the will, and acted upon it. He was a priest in orders at

Notre Dame, Ind., and says that he took but little interest or concern in the estate, acting entirely upon the suggestions of Emily and his mother, and executed the deeds and other papers they sent him, and taking what money they chose to send him, without question. But he knew of the mortgages executed by Emily, and made no protest against them. February 20, 1888, before his mother's death, but after the death of Emily, he wrote a letter to De Broux, who is also a Catholic priest, in answer to one received from him, claiming that Emily's husband had used all the money received from the loan evidenced by the $5,000 mortgage. It would appear from this letter that De Broux was seeking a payment of the mortgage from the estate of Emily, Louis being named executor in her will, or from Louis and the mother. Louis in his letter says that he had delayed writing in order that he might get the advice of a "learned professor" at Notre Dame, and that such advice coincided with his own views. He further writes that he did not know until she died that he had been named in his sister's will as executor, and that he had turned over the trust to Mr. Otto, at Mt. Clemens, being sick at the time his sister died. He concludes his letter as follows:

"As you can well understand, neither I nor any member of our family is responsible; nor can I in justice, nor in conscience, be bound to pay one cent, either of interest or capital, of any moneys which Mrs. Henquenet borrowed, since Mr. H. has received it all for his own benefit. I do not know how the mortgage is made. I would indeed be sorry that any one should lose anything through my fault, and I do not see any other method to get back the money you lent, except by foreclosure on the property in Detroit. Of course, only Emily's share in that property could be attacked, and, if there was not enough there, she had a half share in a lot and house in Mt. Clemens.

"Mr. Henquenet has acted in all this in a most unjust manner towards our family; for the Detroit

property was devised to him only for his life-time, and then it was to revert to the family. How can he, as a Catholic, be safe in conscience? As long as my mother lives, she has a right to all the revenues of the Detroit property. We had not the means to take up the mortgage, and, if we had, it would be folly for us to do so, as Mr. H. could play the gentleman at our expense as long as he lives. Mr. H. is obliged to pay the interest on the money he got, and, if he refuses, what remains to be done is, I presume, to foreclose on that property that was mortgaged. If Mr. H. could succeed, he would gladly grab every cent of the family. If he has $30,000 worth of property in Hope, he is indebted to our family for it. But he is not thankful for this. He pretends that we have done nothing for him. May God forgive him.

"I presume it would be advisable to see Mr. Otto, whom I appointed to replace me, in regard to my sister's affairs. I will send him a copy of your letter, and will tell him of my writing to you. I hope, Rev. Father, that the parties who hold the mortgage will not suffer any loss, nor you either. I understand that Fr. Ryckaert has a mortgage on that property for $2,000.

"Wishing you all blessings, I remain your sincere friend in the Sacred Heart,

L. J. L'ETOURNEAU, C. I. C."

This letter shows conclusively that he then understood the will as Emily understood it, although he attempted to convey the impression in his testimony that he had no thought or understanding about it until he took legal advice some time afterwards, when he thought Mr. Henquenet was becoming "aggressive."

It therefore conclusively appears that all the members of this family, except Sarah, who was incompetent and unable to act for herself, for 28 years since the death of their father, have understood and interpreted his will as the defendants now contend it should be construed, and have uniformly acted upon such understanding and interpretation until within a short time before the filing of this bill. In equity the complainant Louis, and Josephine, ought

to be estopped from now placing a different construction upon this will,—one that will declare these mortgages void and of no effect, and leave the innocent holders of them without any remedy or redress, except against the estate of Emily, which amounts to but little, if anything, outside of the property she supposed she inherited from her father. If the language of the will were so clear and certain that the construction claimed by complainants must prevail, we should not hesitate, under the rule that he who seeks equity must do equity, to leave the matter where these adult heirs, as far as they are concerned, have left it by this family arrangement and understanding of over a quarter of a century. Since the filing of this bill, the incompetent, Sarah, has died, and the bulk of her interest in her father's estate will descend to Louis and Josephine. They, with the granddaughter, Margaret, are the sole heirs to the property.

But we are satisfied that the proper construction of this will is as the mother and children construed it in the first place. It will be noticed that the third clause of the will devises this property:

"To have and to hold the same to the said Sarah, Emily, and Eleanor, their heirs and assigns, forever, after the determination of the life-estate aforesaid."

If it were not for the eighth clause of the will, it would not be doubted that, on the death of their father, the fee of this property would have vested in these three girls, subject only to the life-estate of their mother. The eighth clause reads as follows:

"And whereas, one or more of my said children may not survive me *or my said wife,* I hereby order, direct, and devise the share of such devisee or devisees in such case to be equally divided amongst the remaining chil-

89 MICH.—29.

dren herein named, and to their heirs, share and share alike."

The italics are ours.

The intent of this clause as it stands, and connected with the other clauses of the will, is not clear and certain. The complainants' counsel, to make it harmonize with their views, claim that the word "or" in the italicized words must be read "and" so that it will read "may not survive me and my said wife." The counsel say:

"We submit that the word 'or' in the eighth clause, where it occurs in the expression 'survive me or my said wife,' should be read 'and.' The testator had in the third clause, by very forcible and clear language, attempted to postpone any effect of his gift to the three daughters until the death of his wife. He now in the eighth clause is providing for the distribution to be made when the gift is to operate, and contemplates the contingency of the death of one or more before distribution. It is impossible to conceive why the wife is mentioned at all in the eighth clause on any other hypothesis. 'Or' will be read 'and' whenever such reading is necessary to give effect to the evident intent of the testator."

It is possible in my mind to conceive why the wife is mentioned upon another hypothesis, and I think with Mr. Atkinson, as stated in his brief, that the sentence was intended by the testator as follows: "And whereas, one or more of my said children may not survive me, or my said wife may not survive me, I hereby order," etc.; that, in the contemplation that some of the children might die before he did, the thought also occurred that his wife might not survive him; and that the awkwardness or incompleteness of the expression is that of the scrivener, and not of the testator's intention. In connection with this matter, it is noticeable that the same person who drafted the will also drew the will of Timothy,

who had nothing to devise in his father's estate, if the construction of his father's will be as contended by the complainants.

We agree with the complainants' solicitors that "the commanding and controlling rule of interpretation requires that the intention of the testator ascertained from the will, looking to the whole of it, and reading it in the light of the surroundings of the testator at its date, is to be given full effect, if lawful." Is it to be supposed that the testator intended to disinherit the children of his children, if any child of his, living at his death, should die before the wife and mother did? He is very particular to state why he wills no more to his grand-child Margaret, daughter of a dead son, and gives her $10, *if she survives him.* Josephine was married and had two children. Did he intend to disinherit them, if their mother died before his wife did? On the contrary, he evidently intended by the fourth clause of his will that the property devised to Josephine should go at her death to the heirs of her body. It will be observed that the grants to other children are to them, "their heirs and *assigns;*" while in Josephine's case the word "assigns" is omitted, clearly showing an intention that Josephine could not dispose of the farm without her children's consent, and under this idea they joined with her in conveying it when she sold it. Yet if Josephine had died before her mother, under the complainants' theory her children would have been disinherited.

It is the policy of our laws not to disinherit heirs, unless it clearly and distinctly appears that such was the purpose of the testator. The law also favors vested estates, and a remainder is not to be construed as contingent when it can consistently be construed to be vested. A will speaks from the testator's death, and legacies then vest, unless a contrary intent is clearly indicated in the

will. *Eberts v. Eberts,* 42 Mich. 404; *Rood v. Hovey,* 50 Id. 395; *Toms v. Williams,* 41 Id. 552; *Rivenett v. Bourquin,* 53 Id. 10; *Union Mutual Association v. Montgomery,* 70 Id. 587; *Porter v. Porter,* 50 Id. 456; *McCarty v. Fish,* 87 Id. 48.

The case of *Rood v. Hovey, supra,* is very closely in point with the case here. The will devised a life-estate to the testator's widow, remainder to his children " now living, *or who may be at the time of her decease or marriage.*" The word *" or "* might be read *" and "* as well in this instrument as the one before us; in which case it would appear as clearly as here that the legacies were not intended to vest, and that the children of a child dying between the death of the testator and the decease of his widow would be disinherited. All the children survived the testator, but two died before the widow, and one left surviving him a widow and children. Mr. Justice CAMPBELL, speaking for the Court, after referring to the general rules of construction, which have been heretofore pointed out in the present opinion, says:

"We do not think it proper to go into any extended discussion of testamentary law, because we have not been able to discover the least ambiguity in the language of this will. It says as plainly as words can make it that all of his children then living shall share in his estate not otherwise disposed of; that is, in all but the widow's interest. If there had been no other words no one could dispute that their interest was vested. The remaining words, 'or who may be at the time of her decease,' might very well apply to posthumous children, but the form of the expression is not such as to indicate an intent to qualify the former language as to living children. * * * There is nothing in the rest of the will favoring the idea that he had any purpose of disinheriting any of the offspring of his children. No amount of reasoning can throw much light on the meaning of the will. In our opinion the language used conforms to the general purposes of the law, and is best interpreted by the general rules before referred to."

We think the language of Mr. Justice CAMPBELL applicable to the will before us, and that it controls this case. See, also, *Porter v. Porter*, 50 Mich. 456; *Rivenett v. Bourquin*, 53 Id. 10.

In this view of the intent and construction of the will, the court below was correct, and found in its decree that the interest of Eleanor, at her death, descended in equal shares to Clotilde, the mother, Louis, Emily, Sarah, Josephine, and Margaret. The mother having died and devised the property to Louis, Sarah, and Josephine, the decree fixes the title at the time of the submission of the cause as follows: Emily's estate, 21-54; Sarah's estate, 22-54; Louis, 4-54; Margaret, 3-54; Florence Brewer, 2-54, and Horace R. Brewer, 2-54,—being the share divided between them belonging to Josephine, and which she conveyed to Morton. The mortgages given by Emily were decreed to be a valid lien upon an undivided 21-54 of the property; that the 21-54 belonging to Emily's estate passed in equal shares of 7-54 to Sarah, Josephine, and Louis, subject to the life-estate of August Henquenet. The court also found that the Brewer children, through Mrs. Paquette's deed of one-twelfth of these premises to Morton, under whom they claim, were entitled to so much of her share of Emily's interest in the premises as was equal to one-twelfth of the same.

The decree should be affirmed, with costs of this Court against the complainant Louis J. l'Etourneau, in favor of the defendants Brewer, Henquenet, De Broux, and Duchaineau.

GRANT, J., concurred with MORSE, J.