# KATERINA NICOLOVA EVANOVA TODEVA, WIDOW OF NICK EVANOFF, v. OLIVER IRON MINING COMPANY. J. HOWARD McGRATH, RELATOR.[1]

January 19, 1951.

No. 35,259.

[1]Reported in 45 N. W. (2d) 782.

*Harold I. Baynton,* Acting Director, Office of Alien Property, *C. U. Landrum,* United States Attorney, *Clifford F. Hansen* and *James J. Giblin,* Assistant United States Attorneys, and *James L. Morrisson, Ralph S. Spritzer,* and *Robert B. McKay,* Attorneys, Department of Justice, for relator.

*Arthur R. Smythe* of *Smythe & Lindquist,* for respondent petitioner.

*W. O. Bissonett,* for respondent Oliver Iron Mining Company.

*J. A. A. Burnquist,* Attorney General, and *Victor H. Gran,* Assistant Attorney General, for Industrial Commission.

MATSON, JUSTICE.

Certiorari to review an order of the industrial commission denying the demand of the alien property custodian for the payment and delivery to him of the accrued and unaccrued compensation benefits awarded to a nonresident alien widow, which order of denial further directed the employer to resume payment of such compensation benefits to the widow.

On October 11, 1938, Nick Evanoff was killed in the course of his employment. His sole surviving dependent was his wife, Katerina Nicolova Evanova Todeva, who was then, and ever since has been, an alien residing in Bulgaria. On September 22, 1939, the industrial commission awarded the widow compensation at the rate of $13.29 per week commencing October 11, 1938, and to continue thereafter—subject to the provisions of the workmen's compensation act—during her dependency, but not to exceed the sum of $7,500. The controversy over whether the alien property custodian or the widow is entitled to the death compensation benefits arises out of the application of a war measure known as the Trading with the Enemy

Act.[2] The act creates powerful, swift, and summary procedures for the seizure and sequestration of property rights and interests owned or controlled by enemy countries and their nationals. See, Stoehr v. Wallace, 255 U. S. 239, 41 S. Ct. 293, 65 L. ed. 604, and Central Union Trust Co. v. Garvan, 254 U. S. 554, 41 S. Ct. 214, 65 L. ed. 403. Pursuant thereto (50 USCA Appendix, § 5[b]), the President on April 10, 1940, issued Executive Order No. 8389 (5 F. R. 1400, 12 USCA, § 95a note), which froze and immobilized all property rights and interests owned or controlled by enemy countries and their nationals and specifically prohibited any transport, exportation, dealing in, or the exercise of, any right, power, or privilege with respect to such property rights and interests. After Germany invaded and took control of Bulgaria, this freezing order was extended to Bulgaria and its nationals by Executive Order No. 8701, issued March 4, 1941 (6 F. R. 1285, 12 USCA, § 95a note), or seven months before the suspension of compensation payments to Mrs. Todeva. This country declared war on Bulgaria on June 5, 1942. Executive Order No. 9095, dated March 11, 1942 (7 F. R. 1971),[3] established the office of alien property custodian and authorized the custodian to take such action as he deemed necessary in the national interest, inclusive of the power to direct, manage, supervise, control, or *vest in himself*—

"(c) any * * * property or interest within the United States of any nature whatsoever owned or controlled by, payable or deliverable to, held on behalf of or on account of, or owing to, or which

[2]40 Stat. 411, 50 USCA Appendix, §§ 1 to 31. The Trading with the Enemy Act, whether taken as originally enacted (October 6, 1917) or as since amended (March 28, 1918, November 4, 1918, July 11, 1919, June 5, 1920), is strictly a war measure and finds its sanction in the federal constitutional provision, Art. I, § 8, cl. 11, empowering congress "To declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water."

[3]As amended, Executive Order No. 9193, dated July 6, 1942, 7 F. R. 5205; Executive Order No. 9567, dated June 8, 1945, 10 F. R. 6917 (50 USCA Appendix, § 6 note).

is evidence of ownership or control by, a designated enemy country or national thereof: * * *."

In express recognition of the President's freezing of the property rights and interest of enemy countries and their nationals and upon petition of the employer, the industrial commission by order dated October 1, 1941, authorized the employer *to suspend further payments of compensation* to Mrs. Todeva until peace had been declared in Europe or until further order of the commission. In its order of suspension, after referring specifically to Executive Order No. 8389, the commission, apparently as a further basis for its action, said that there appeared to be no practical or lawful method available whereby payments to Mrs. Todeva could be made with reasonable certainty that they would reach her and not be appropriated by German authorities, and that it was for the best interests of both parties (Mrs. Todeva and the employer) that such payments be suspended until peace had been restored. At the time of the order of suspension, Mrs. Todeva had received under the compensation award weekly payments from October 11, 1938, until July 1, 1940, in an aggregate total of $1,193.90, which, assuming that the widow continued to live and did not remarry, left an unpaid balance of $6,306.10 due her under the award.

A treaty of peace with Bulgaria did not become effective until September 15, 1947 (61 Stat. Part 2, p. 1915). On February 26, 1946, the alien property custodian,[4] having determined that Mrs. Todeva was a national of Bulgaria, issued Vesting Order No. 5974, whereby he vested in himself *"All right, title, interest, and claim of any kind or character whatsoever"* in and to Mrs. Todeva's compensation award. Shortly thereafter, the custodian made demand upon the employer for the payment and delivery to him of all the property described in the vesting order. This was followed by the

---

[4]His powers and duties have since been taken over by the attorney general of the United States by Executive Order No. 9788, dated October 15, 1946 (11 F. R. 11981, 50 USCA Appendix, § 6 note), but for convenience the term "custodian" will be used herein as referring to the alien property custodian or to his successor, the attorney general.

custodian's application to the commission for an order directing the employer to pay to him all accumulated compensation payments then owing under the award to Mrs. Todeva, as well as all future payments as they should accrue.

Upon review of the industrial commission's order denying the custodian's application, which order directed the resumption of payment of compensation benefits to Mrs. Todeva, we have the following issues:

(1) Subject to the statutory limitations as to total amount, does a widow who is the sole surviving dependent of her husband, who was accidentally killed while covered by the Minnesota workmen's compensation act, immediately upon her husband's death acquire a fixed statutory right to the payment of compensation benefits which continues unimpaired as long as she survives and does not remarry?

(2) Is the widow's right to compensation benefits upon the death of her husband, the employe, a property right, and, if so, does it extend to installments which have not accrued or become payable under the industrial commission's award?

(3) Did the widow's rights to compensation benefits under the award vest in and come under the control of the alien property custodian?

It is admitted that Mrs. Todeva is a nonresident alien who still survives and who has not remarried.

 A widow of an employe who dies as the result of a compensable accident, pursuant to M. S. A. 176.12, acquires at the time of her husband's death a fixed statutory right to weekly compensation benefits in an aggregate total of not to exceed $7,500 (changed to $10,000 by L. 1949, c. 540, § 4), and this fixed statutory right continues unimpaired as long as she survives and does not remarry. Warner v. Zaiser, 184 Minn. 598, 239 N. W. 761. The theory of the act is that the dependents of a workman have a pecuniary interest in the normal continuation of his life, and its purpose is to compensate them for the loss they suffer when he is accidentally killed

or dies from compensable injuries. Fehland v. City of St. Paul, 215 Minn. 94, 9 N. W. (2d) 349. In Dale v. Shaw Motor Co. 206 Minn. 99, 101, 287 N. W. 787, 788, we said:

"The right of dependents to compensation benefits for the death of the workman is a distinct and independent statutory right which arises at the time of the workman's death. Lewis v. Connolly Contracting Co. 196 Minn. 108, 264 N. W. 581. Until then, there is not a matured right of action but rather an inchoate right, contingent in nature and entirely dependent upon the employe's death."

In determining the nature and scope of the right of a disabled workman, or of his dependents if he dies from a compensable injury, it is well to bear in mind that compensation acts are *sui generis*,[5] and the rights and liabilities created thereunder are to be given full force and effect according to their own unique status, although they may not fit into the timeworn grooves of other areas of the law. In a certain limited sense, the rights and liabilities arise out of contract, on the theory that the statute becomes a part of the contract of employment (see, Warner v. Zaiser, 184 Minn. 598, 239 N. W. 761; Sandy v. Walter Butler Shipbuilders, Inc. 221 Minn. 215, 218, 21 N. W. [2d] 612, 614); but, strictly speaking, such rights and liabilities are created independently of any actual or implied contract and, pursuant to the police power, are imposed upon the employment status or relationship as a cost of industrial production.[6] As a purely statutory creation

[5]See, Olson v. Trinity Lodge, 226 Minn. 141, 144, 32 N. W. (2d) 255, 257; Hanson v. Robitshek-Schneider Co. 209 Minn. 596, 297 N. W. 19; Horovitz, Current Trends in Workmen's Compensation, pp. 509-511.

[6]See, Alaska Packers Assn. v. Industrial Acc. Comm. 294 U. S. 532, 55 S. Ct. 518, 79 L. ed. 1044; Cudahy Packing Co. v. Parramore, 263 U. S. 418, 44 S. Ct. 153, 68 L. ed. 366, 30 A. L. R. 532; Lane v. Industrial Commr. (2 Cir.) 54 F. (2d) 338, 86 A. L. R. 765; 58 Am. Jur., Workmen's Compensation, § 4; cf. Fehland v. City of St. Paul, 215 Minn. 94, 9 N. W. (2d) 349, wherein rights of dependents under compensation act are likened to rights of surviving spouse and next of kin under the wrongful-death statute (§ 573.02), and Mitchell v. Industrial Comm. 57 Ohio App. 319,

based on status, it confers, when certain operative facts come into existence, a personal but present and fixed right to the future enjoyment of periodic compensation payments. In other fields of the law, it is recognized that certain rights or interests, whether present or future, may be vested, and that the vesting may be either absolute or defeasible. L'Etourneau v. Henquenet, 89 Mich. 428, 50 N. W. 1077, 28 A. S. R. 310; Black's Law Dictionary (3 ed.) 1811. When compensation installments have once become due and payable in the lifetime of the beneficiary, the right to them becomes vested in him absolutely; but as to future payments, which are still to come due, the right is not vested absolutely, but in a defeasible sense. We have heretofore pointed out that as to future payments which are yet to come due, the right to them is defeasible and terminates upon death and is therefore not vested in the sense of being transmissible to one's heirs. Tierney v. Tierney & Co. 176 Minn. 464, 223 N. W. 773. By express statutory provision, the right to compensation is not assignable, but this is of no significance. The seizure by the alien property custodian is not for the payment of any debt or liability, but for the protection of the nation.[7] With due regard to all the limitations which qualify the right of compensation under an award, both as to accrued and as to future installments, it is undoubtedly a definite and fixed statutory right, which, once acquired, the possessor may have enforced and protected through court action. The possessor's ownership of that right is protected by the state. *Property* has been appropriately defined as consisting of an aggregate of rights which are guaranteed and protected by the government. See, Black's Law Dictionary (3 ed.) 1446. It follows that, once an award of compensation has been made to the dependent of a workman who has died as a result of a compensable accident, the dependant's right to compen-

---

13 N. E. (2d) 736, wherein a person who was impressed into police service by a deputy sheriff was held to be governed by the act although his employment was not voluntary but compulsory.

[7]See, Matter of Bendit, 214 App. Div. 446, 212 N. Y. S. 526, in re spendthrift trust.

sation thereunder, both as to accrued and as to future compensation installments—subject to the exercise by the industrial commission of a sound discretion in supervising the manner of payment—becomes vested in the individual as a constitutionally protected property right which cannot be impaired by the industrial commission or by future legislative enactment. Warner v. Zaiser, 184 Minn. 598, 239 N. W. 761; Salmon v. Denhart Elevators, 72 S. D. 110, 30 N. W. (2d) 644; Arnold & Murdock Co. v. Industrial Comm. 314 Ill. 251, 145 N. E. 342, 40 A. L. R. 1470; Casieri's Case, 286 Mass. 50, 190 N. E. 118. It is unique in that it cannot be surrendered by agreement, assigned, or transmitted to the possessor's heirs, and in that it is subject to defeasance for failure of the possessor to remain single or to survive, yet it is a bona fide right of property.

Without question, Executive Order No. 9095, *supra*, which authorized the custodian to vest in himself any property right or interest of an enemy national, and Vesting Order No. 5974, issued pursuant thereto, were both broad and inclusive enough to cover Mrs. Todeva's entire property right in the award, both as to accrued and as to future installments of compensation. At the time the President's freezing order was issued (Executive Order No. 8389, *supra)*, and likewise when it was amended on March 4, 1941, to apply specifically to Bulgaria and its nationals (Executive Order No. 8701, *supra)*, Mrs. Todeva's property right in the award existed in its full maturity. The freezing order was designed to preserve the *status quo,* and from the moment of its issuance it prevented any change in the status of Mrs. Todeva's property rights. It was further designed to require that all transactions involving the property of an enemy national be thenceforth carried out under regulations of the federal government. By its inclusive scope, it covered compensation awards. See, Clark v. Propper (2 Cir.) 169 F. (2d) 324, affirmed, 337 U. S. 472, 69 S. Ct. 1333, 93 L. ed. 1480. The industrial commission's order suspending compensation payments was made in express recognition of the President's freez-

ing order, and such order alone both justified and required the suspension. Any statement by the commission that the suspension was in part ordered for Mrs. Todeva's welfare was surplusage. Although the workmen's compensation act is to be administered for both the welfare of disabled workmen and their dependents and for the protection of the public, in time of war the protection of the public, from the standpoint of the national welfare as a whole, becomes paramount and overrides any and all other considerations with respect to compensation awards in favor of nonresident nationals of an enemy country. Without doubt, any property in this country of an enemy national may be summarily reduced to possession by the United States in the furtherance of the war effort, and under the war power such enemy-owned property may be confiscated or vested in the national government. Silesian-American Corp. v. Clark, 332 U. S. 469, 68 S. Ct. 179, 92 L. ed. 81. As immobilized or frozen, Mrs. Todeva's property right in the award became subject to future seizure or vesting by the alien property custodian. His vesting order followed on February 26, 1946. It is well settled that the issuance of a vesting order operates to transfer immediately to the United States the property right and interest described in the order and to divest the former owner of every right therein. Cf. In re Estate of Eckes, 162 Minn. 226, 202 N. W. 492; Cummings v. Deutsche Bank, 300 U. S. 115, 57 S. Ct. 359, 81 L. ed. 545; Commercial Trust Co. v. Miller, 262 U. S. 51, 43 S. Ct. 486, 67 L. ed. 858; *The Antoinetta* (D. C.) 49 F. Supp. 148, affirmed (3 Cir.) 153 F. (2d) 138. The vesting of compensation awards by such order has been recognized under similar workmen's compensation provisions in other jurisdictions. Maryland Cas. Co. v. Chamos, 203 Ky. 820, 263 S. W. 370; Milwaukee-Western Fuel Co. v. Industrial Comm. 172 Wis. 561, 179 N. W. 763. Cf. Youghiogheny & Ohio Coal Co. v. Lasevich, 171 Wis. 347, 176 N. W. 855.

The moment the vesting takes place, the custodian steps into the shoes of the alien beneficiary of the compensation award and thereby acquires the exclusive possession of all rights of the

original owner without impairment or change, and the rights so acquired by the custodian are not limited to the duration of the war and are not terminated by any subsequent declaration of peace. See, Matter of Bendit, 214 App. Div. 446, 212 N. Y. S. 526; Miller v. Rouse (D. C.) 276 F. 715. Once the compensation rights are vested in the custodian, the industrial commission must thenceforth recognize him as the permanent successor and alter ego of the original compensation beneficiary, and the proper disposal of the *proceeds* of compensation payments, accrued and unaccrued, becomes exclusively a federal question. It is not for the state to determine when the custodian shall relinquish his vested right to the compensation benefits to which the original dependent beneficiary would otherwise have been entitled. Although Mrs. Todeva has no remedy in the state courts, she is not, however, without a remedy, in that she may obtain a judicial determination of her future rights, if any, pursuant to the Trading with the Enemy Act. 40 Stat. 411, with amendments to March 10, 1928, 50 USCA Appendix, §§ 7(c), 9(a).[8] She may also apply for administrative relief. Trading with the Enemy Act, § 32.

█ Should the custodian's demand for interest be allowed on accrued compensation installments? The President's freezing order prevented the employer from making any further compensation payments. The order of the industrial commission, which followed, simply suspended the making of further payments and made no provision for the accumulation of benefit installments as they should come due. The employer was powerless to pay and was wholly without any legal obligation to make any disbursement under the award while the freezing order was in effect, and this situation continued until the custodian issued a vesting order. In Bourdeaux v. Gilbert Motor Co. 220 Minn. 538, 543, 20 N. W.

---

[8]See, Clark v. Uebersee Finanz-Korp., A. G., 332 U. S. 480, 68 S. Ct. 174, 92 L. ed. 88; McGrath v. Manufacturers Trust Co. 338 U. S. 241, with note 8 at p. 246, 70 S. Ct. 4, 7, 94 L. ed. 31, 35; Central Union Trust Co. v. Garvan, 254 U. S. 554, 41 S. Ct. 214, 65 L. ed. 403; In re Estate of Eckes, 162 Minn. 226, 202 N. W. 492.

(2d) 393, 395, we quoted with approval from Henderson Cotton Mfg. Co. v. Lowell Machine Shops, 86 Ky. 668, 675, 7 S. W. 142, 145, as follows:

"The true ground upon which to put the allowance of interest is the fault of the party who is to pay the debt. If he has made default of payment, then, ex aequo et bono, he should reimburse the creditor for keeping him out of the use of his money. He should render an equivalent for the use of what is not his own. If there be a specified time for payment, and a failure to then pay, or a demand of payment of a liquidated claim, and default, then the debt should, as a matter of law, bear interest from the time of such failure. This is the current of authority, and it is supported by both right and reason."

As already noted, until the vesting order was issued, there was no one to whom the employer could make payment, and there was no failure to pay. The moment, however, the vesting order was issued, all accrued installments became due and payable to the custodian to the same extent as they would have been payable to the original owner of the compensation award, namely, Mrs. Todeva, if the freezing order had then been cancelled. From the moment the principal of the accrued installments became due and payable, the obligation to pay interest commenced, in that interest goes with the principal as the fruit with the tree. Bourdeaux v. Gilbert Motor Co. *supra*. Although no interest was payable on the accrued compensation installments while the President's freezing order prevented the employer from making any disbursement under the award, once the custodian was vested with the right to receive the compensation installments which had accrued, he became entitled not only to the accrued principal, but also to receive interest thenceforth upon any accrued amount which was thereafter withheld, and no action of the industrial commission, by continuation of its order of suspension or otherwise, could deprive him of such principal or interest.

Pursuant to the vesting of the compensation award in the custodian, any allowance for attorney's fees for services rendered in behalf of the enemy national who was the original owner must be asserted under the Trading with the Enemy Act. See, In re Estate of Eckes, 162 Minn. 226, 202 N. W. 492.

The order of the industrial commission is reversed with directions to proceed in accordance with this opinion.

Reversed.