In the Matter of the Judicial Settlement of the Account of Proceedings of MAX DREY, a Deceased Surviving Trustee under the Last Will and Testament of SIGMUND L. BENDIT, Deceased, by LILLIAN B. DREY and Another, as Executors, and of the Account of SIGMUND BENDIT, a Sole Surviving Trustee under the Last Will and Testament of SIGMUND L. BENDIT, Deceased.

THOMAS W. MILLER, as Alien Property Custodian of the United States, Appellant, Respondent; LILLIAN B. DREY and Others, Respondents, Appellants.

First Department, November 27, 1925.

Trusts — alien enemy beneficiary — rights of Alien Property Custodian not affected by Personal Property Law, § 15 — Alien Property Custodian had right to all income accrued and accruing throughout life of trust until otherwise provided by law — Alien Property Custodian is entitled to income accruing after peace resolution of July 2, 1921 — peace resolution did not cut off his right.

The rights of the Alien Property Custodian appointed under the Trading with the Enemy Act to receive the income from a trust payable to an alien enemy is not affected by section 15 of the Personal Property Law, to the effect that the right of the beneficiary to enforce the performance of a trust to receive the income of personal property and to apply it to the use of any person, cannot be transferred by assignment or otherwise.

The Alien Property Custodian is entitled, under the Trading with the Enemy Act and executive orders issued thereunder, to all income on a trust for the benefit of an alien enemy residing in Germany which had accrued at the time of the demand made by the Alien Property Custodian upon the trustee and all income thereafter accruing until otherwise provided by law. In effect the

Alien Property Custodian becomes a beneficiary until provision is made other-
wise by statute.

The peace resolution passed on July 2, 1921, by the Congress of the United States,
which put an end to the war between this country and Germany, did not operate
to cut off the right of the Alien Property Custodian to the income of a trust
payable to an alien enemy and, in fact, his rights were preserved by that
resolution.

Accordingly, the Alien Property Custodian is entitled to the income not accounted
for accruing after July 2, 1921, as well as that which accrued prior thereto.

APPEAL by Thomas W. Miller, as Alien Property Custodian of
the United States, from that part of a decree of the Surrogate's
Court of the county of New York, entered in the office of said
Surrogate's Court on the 9th day of February, 1925, which adjudges
and decrees that Pauline Heidenheimer is entitled to receive the
net income earned since July 2, 1921, shown by the account, and
decrees the payment thereof.

Appeal by Lillian B. Drey and others from that part of said
decree which adjudges and decrees that the Alien Property Custodian
of the United States is entitled to receive the net income earned to
July 2, 1921, as shown by said account, and directs the payment
of said sum to the Alien Property Custodian.

*Duer & Taylor* [*Ralph C. Taylor* of counsel], for the appellant,
respondent.

*Laurence Arnold Tanzer* [*Eugene L. Mullaney* with him on the
brief], for the respondents, appellants.

MERRELL, J.:

The question presented upon this appeal is as to the rights of
Thomas W. Miller, as Alien Property Custodian of the United
States, to certain accrued income upon a trust provided in the will
of said Sigmund L. Bendit, deceased, for the benefit of Pauline
Heidenheimer, a sister of said decedent, who resided in Nuremberg,
Germany. The corpus of the trust, as shown by the account, is
the sum of $58,951.17. By the 2d clause of the will of testator
there was given to his executors the sum of $37,500 in trust to keep
the same invested and to receive the rents, income and profits
therefrom and to pay the net income and interest thereof in at
least semi-annual installments to testator's said sister. After the
death of the said sister the will directed that the principal of said
trust should become a part of and be disposed of in like manner as
the testator's residuary estate. By a subsequent clause of his
will the residuary estate was bequeathed to the testator's executors
in trust to receive the income and pay the same to decedent's wife,
Grace F. Bendit, during her natural life, and on her death the
principal to be paid to decedent's issue then surviving, but in the

event that no issue of the decedent survived his wife the testator directed that the residuary estate be divided into four equal shares, including in the residuary for the purposes of such provision the $37,500 provided as a trust fund for the benefit of decedent's said sister, and the will provided that one of the four shares, if the said sister, Pauline Heidenheimer, should be then living, was to be held by his said executors upon the trust specified for the benefit of said sister, provided that the amount of said trust fund should in no event be less than the sum of $37,500, and upon her death the testator directed that the said one-fourth share be paid to her lawful issue then surviving, *per stirpes* and not *per capita*, share and share alike. The controversy here presented relates to the income from the original trust fund of $37,500 provided for testator's sister and from the share of the residuary disposed of as aforesaid.

Testator's widow died June 25, 1915, leaving no issue. An accounting was then had, the executor of decedent's wife joining with the executors of the decedent in an account, and a decree settling said account was entered in Surrogate's Court August 29, 1917, and thereby the trustees were directed to pay over to themselves as surviving trustees the sum of $58,951.17 in cash and securities as the principal of the trust for decedent's said sister, Pauline Heidenheimer. By the terms of the decree the trustees were also directed to pay over to said sister the sum of $4,585.34, accrued income on said trust fund. Prior thereto, however, all income from the trust fund had been seized by the Alien Property Custodian. The Alien Property Custodian was appointed pursuant to the act of Congress, known as the " Trading with the Enemy Act," which became effective October 6, 1917. (See 40 U. S. Stat. at Large, 411, chap. 106; Id. 415, § 6.) Under subdivision (c) of section 7 of said act it was provided that if the President should so require, any money or other property, owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of an enemy or ally of an enemy not holding a license granted by the President under said act, which the President after investigation should determine was so owing or so belonged or was so held, should be conveyed, transferred, assigned, delivered or paid over to the Alien Property Custodian. (40 U. S. Stat. at Large, 418, § 7, subd. c. See, also, 40 id. 1020, chap. 201, amdg. said subd.) After the passage of the Trading with the Enemy Act, the President, from time to time, issued executive orders to carry into effect said act. Said orders had the force of law. On October 12, 1917, the President issued an executive order (U. S. Official Bulletin, vol. 1, No. 135, p. 7, Oct. 17, 1917) which, among other things, provided as follows:

" XXIX. I hereby vest in an Alien Property Custodian, to be hereafter appointed, the executive administration of all the provisions of section 7 (a), section 7 (c), and section 7 (d) of the Trading with the Enemy Act, including all power and authority to require lists and reports, and to extend the time for filing the same, conferred upon the President by the provisions of said section 7 (a), and including the power and authority conferred upon the President by the provisions of said section 7 (c), to require the conveyance, transfer, assignment, delivery, or payment to himself, at such time and in such manner as he shall prescribe, of any money or other properties owing to or belonging to or held for, by or on account of, or on behalf of, or for the benefit of any enemy or ally of an enemy not holding a license granted under the provisions of the Trading with the Enemy Act, which, after investigation, said Alien Property Custodian shall determine is so owing, or so belongs, or is so held."

And on February 26, 1918, an executive order was issued (U. S. Official Bulletin, vol. 2, No. 247, p. 6, March 2, 1918), providing, in part, as follow:

" 1. Definitions.    *    *    *

" (c) The words ' right,' ' title,' ' interest,' ' estate,' ' power,' and ' authority ' of the enemy, as used herein, shall be deemed to mean, respectively, such right, title, interest, estate, power, and authority of the enemy as may actually exist and also such as might or would exist if the existing state of war had not occurred, and shall be deemed to include, respectively, the right, title, interest, estate, power, and authority in law or equity or otherwise of any representative of or trustee for the enemy or other person claiming under or in the right of, or for the benefit of, the enemy.    *    *    *

" 2. Demands Pursuant to Section 7, Subsection ' c.'

" (a)    *    *    *    A demand for the conveyance, transfer, assignment, delivery, and payment of money or other property unless expressly qualified or limited shall be deemed to include every right, title, interest, and estate of the enemy in and to the money or other property demanded, as well as every power and authority of the enemy thereover.    *    *    *

" (c) When demand shall be made and notice thereof given, as hereinbefore provided, such demand and notice shall forthwith vest in the Alien Property Custodian such right, title, interest, and estate in and to and possession of the money or other property demanded and such power or authority thereover *as may be included within the demand,* and the Alien Property Custodian may thereupon proceed to administer such money and other prop-

29

erty in accordance with the provisions of the ' Trading with the Enemy Act ' and with any orders, rules, or regulations heretofore, hereby, or hereafter made by me or heretofore or hereafter made by the Alien Property Custodian."   (Italics are the writer's.)

The Trading with the Enemy Act and the executive orders of the President thereunder have been upheld by the United States Supreme Court and by the courts of this State.   (*Central Union Trust Company* v. *Garvan,* 254 U. S. 554; *Stoehr* v. *Wallace,* 255 id. 239; *Miller* v. *Lautenburg,* 239 N. Y. 132.)   On May 4, 1918, there was served upon the executors and trustees of the estate of Sigmund L. Bendit, deceased, a notice and demand under the hand and seal of A. Mitchell Palmer, Alien Property Custodian, to the effect that said Alien Property Custodian had determined that: " Pauline Heidenheimer, whose address is Nuremberg, Germany, is an enemy (not holding a license granted by the President), and has a certain right, title and interest in and to the estate of Sigmund L. Bendit, deceased."   The notice and demand further stated that the said Alien Property Custodian thereby required " that every right, title and interest of said enemy in and to the estate above described, including every power and authority thereover, shall be by you conveyed, transferred, assigned, delivered and paid over to me as Alien Property Custodian, to be by me held, administered and accounted for as provided by law, and *that any money or property now or hereafter held by you* which the enemy may at any time or times *now or hereafter,* be entitled to receive either upon or without demand, shall at such time or times be conveyed, transferred, assigned, delivered and paid over to me, as Alien Property Custodian."   (Italics are the writer's.)

Thereby, under the terms of the Trading with the Enemy Act and the aforesaid executive orders, the income upon said trust fund became the property of the Alien Property Custodian.   Pursuant to such demand there was paid over by the executors and trustees to the Alien Property Custodian at various times, commencing May 6, 1918, and ending on December 8, 1920, the total sum of $14,252.38.   Two days after such demand was made the account shows that the trustees and executors paid to the Alien Property Custodian the sum of $7,000 of accrued income.   On June seventh they paid to the Alien Property Custodian the sum of $1,000. Said two payments were made in Liberty bonds.   On June 21, 1918, there was paid by said trustees and executors in cash the sum of $567.23, and on December thirtieth in cash, $1,211.25.   On September 30, 1919, there was paid to the Columbia Trust Company, as depositary for the Alien Property Custodian, the sum of $1,433.65, and on December 8, 1920, to the same depositary, the

sum of $3,040.25, making a total payment of $14,252.38. The accounting herein covered a period from January 3, 1917, to February 5, 1923. The net amount of the accrued income on the life estate of decedent's said sister to February 5, 1923, the date of the accounting, remaining in the hands of the trustees, was $7,402.11. By the decree appealed from, the surrogate directed that of this amount, $3,219.59, being the amount of income earned prior to July 2, 1921, when the Congress passed the resolution declaring peace with Germany, should be paid to the Alien Property Custodian, pursuant to said demand, and that the balance of said accrued income, amounting to $4,182.52, which had been earned subsequent to the declaration of peace, be paid to the said Pauline Heidenheimer, the beneficiary in said trust. The Alien Property Custodian has appealed from such decree of the surrogate, claiming to be entitled to the entire accrued income and to be entitled to all of the income upon the trust fund for the benefit of said Pauline Heidenheimer during her natural life or until Congress shall have acted to dispose of the property in the hands of said custodian. The trustees have appealed from the decree of the surrogate, claiming that the Alien Property Custodian was only entitled to such income as had accrued upon said trust fund at the time of the service of said demand and that the subsequent payments which were made by the trustees to said Alien Property Custodian at various times down to the 8th day of December, 1920, all payments aggregating $14,252.38 as aforesaid, were voluntary payments legally received under subdivision (e) of section 7 of the Trading with the Enemy Act (40 U. S. Stat. at Large, 418) which provided that any payment, conveyance, transfer, assignment or delivery of money or property made to the Alien Property Custodian under the act should be a full acquittance and satisfaction for all purposes of the obligation of the person making the same to the extent of the same. The trustees thus insist that not only are they entitled to the income earned after the adoption of the peace resolution by the Congress, but that they are also entitled to receive all income not earned at the time of the service of the demand by the Alien Property Custodian and which was not voluntarily paid by the trustees down to and including the payment made December 8, 1920. The surrogate has held that the demand made by the Alien Property Custodian vested in him only the right to collect the income payable to decedent's sister up to the adoption of the peace resolution by the Congress, and that such demand of the Alien Property Custodian did not vest in him the right to collect the income payable to the *cestui* during her entire lifetime as claimed by the Alien Property Custodian. (124 Misc. 697.)

The surrogate based his decision upon the provisions of section 15 of the Personal Property Law, as amended by chapter 327 of the Laws of 1911, which provides: " The right of the beneficiary to enforce the performance of a trust to receive the income of personal property, and to apply it to the use of any person, cannot be transferred by assignment or otherwise. But the right and interest of the beneficiary of any other trust in personal property may be transferred." While there is no question but what the trust provided by testator in his will was such a trust as contemplated by section 15 of the Personal Property Law, and that the beneficiary had no power to transfer or assign the future income earned by said trust fund (*Matter of Ungrich*, 201 N. Y. 415, 419; *Matter of Wentworth*, 230 id. 176, 185), nevertheless, I am of the opinion that the said provision of the New York statute did not prevent the Alien Property Custodian from acquiring, by authority of the act of Congress and the executive orders aforesaid, whatever interest the alien enemy had under the will of the decedent. This interest was an indefeasible right to receive during her lifetime the interest and income on the trust fund created for the benefit of said alien. Pursuant to the demand made, as held by the learned surrogate below, " the Custodian occupied the same position as the beneficiary of the trust." In other words, the Alien Property Custodian, under the act and the executive orders issued thereon, became the owner for the time being of whatever interest the beneficiary had in the estate of her deceased brother. In *Miller* v. *Rouse* (276 Fed. 715) Judge LEARNED HAND held that the effect of the demand served by the Alien Property Custodian was to substitute the Custodian in the place of the beneficiary and to entitle him to such rights as the beneficiary had under the will. The learned surrogate below held that the Alien Property Custodian was entitled under the demand to collect the income as it accrued while the beneficiary remained an alien enemy, and immediately upon the adoption of the peace resolution by Congress on July 2, 1921, the right of the Alien Property Custodian to said income ceased; that at that time the beneficiary under the trust became an alien friend and entitled to the income upon the trust fund for her benefit.

We are of the opinion that the learned surrogate below was in error in confining the rights of the Alien Property Custodian to the period when this country was at war with Germany. We are of the opinion that the Custodian's interest in the life estate of Pauline Heidenheimer was not divested by the adoption by the Congress of the peace resolution on July 2, 1921. The joint resolution adopted by Congress at that time, and which terminated the war

between this country and Germany, made express provision concerning properties held by the Alien Property Custodian. (See 42 U. S. Stat. at Large, 105, chap. 40.) While the joint resolution adopted by the Congress on July 2, 1921, put an end to the war between this country and Germany, the seizures already made by the Alien Property Custodian were in nowise ineffectuated, but it was expressly provided that the properties thus held by the Alien Property Custodian should be retained by this country and no disposition thereof made, except as theretofore or thereafter authorized by law and until such time as the Imperial German Government or its successor or successors should make suitable provision for the satisfaction of all claims against said government on the part of all persons wheresoever domiciled who owe permanent allegiance to the United States of America and who have suffered through the acts of the Imperial German Government or its agents since July 31, 1914. The joint resolution adopted by the Congress on July 2, 1921, among other things, contained the following provision: "All property of * * * German nationals which was, on April 6, 1917, in or has since that date come into the possession or under the control of, or has been the subject of a demand by the United States of America or of any of its officers, agents, or employees, from any source or by any agency whatsoever, * * * shall be retained by the United States of America and no disposition thereof made, except as shall have been heretofore or specifically hereafter shall be provided by law until such time as the Imperial German Government * * *, or their [its] successor or successors shall have * * * made suitable provision for the satisfaction of all claims * * *." (42 U. S. Stat. at Large, 106, § 5.) Under such provision and in the absence of proof of any disposition having been made by the Congress of the property of German nationals prior to the filing of the account herein, I can see no reason why, at the time of said accounting, the Alien Property Custodian was not entitled to hold any interest of the alien in said estate and to receive all accrued income upon said trust fund. It has been repeatedly held by the Federal courts that the peace resolution adopted by Congress on July 2, 1921, reserved in the Alien Property Custodian whatever rights he had in the property of alien enemies until Congress should otherwise enact. (*Commercial Trust Company* v. *Miller*, 262 U. S. 51, 57; *Matter of Miller* [*Re Schaefer*], 281 Fed. 764, 775, 776; *Matter of Miller* [*Re Schwab*], 288 id. 760, 767.) So recently as May 27, 1925, the United States District Court for the Southern District of Florida (*Hess* v. *Miller*, 6 Fed. [2d] 388) held that where, under a will, an alien enemy legatee

was to receive during her lifetime the interest on certain investments of the testator, seizure of the legatee's interest in the legacy by the Alien Property Custodian vested him with the right to receive such interest payments until their disposition is provided for by Congress. In the last mentioned case the court held that the Custodian seized the interest the alien had under the will, not the particular payments which might have been made under the terms of that instrument during hostilities, and that this being so, the Custodian was entitled to and must hold that interest until it could be disposed of as provided by Congress and the treaty with Germany. Under the express terms of article 1 of the treaty adopted between Germany and the United States it was provided: " Germany undertakes to accord to the United States, and the United States shall have and enjoy, all the rights, privileges, indemnities, reparations or advantages specified in the aforesaid Joint Resolution of the Congress of the United States of July 2, 1921." (42 U. S. Stat. at Large, 1942.) I am, therefore, of the opinion that the learned surrogate erred in holding that the rights of the Alien Property Custodian to the income of the trust fund for the benefit of testator's sister ended with the adoption of the peace resolution.

The period for which the accounting herein is had was from January 3, 1917, to February 5, 1923, and the income which is the subject of this controversy accrued prior to February 5, 1923. It is interesting to note that by act of Congress, which became effective March 4, 1923, and which among other things added section 23 to the Trading with the Enemy Act, it was enacted that " The Alien Property Custodian is directed to pay to the person entitled thereto, from and after the time this section takes effect, the net income, dividend, interest, annuity, or other earnings, accruing and collected thereafter, on any property or money held in trust for such person by the Alien Property Custodian or by the Treasurer of the United States for the account of the Alien Property Custodian, under such rules and regulations as the President may prescribe; but no person shall be paid, under this section, any amount in excess of $10,000 per annum." (42 U. S. Stat. at Large, 1516, chap. 285, § 2, adding to 40 id. 426, chap. 106, § 23.) It would seem that Congress had thus made provision for the payment, in a limited amount, of income derived from trust estates seized by the Alien Property Custodian, to the beneficiaries entitled thereto, but such act took effect subsequently to the accrual of the income accounted for herein, and, therefore, is not applicable to such income. If and when the act of Congress which took effect March 4, 1923, shall have been made effective as therein provided, the Alien Property Custodian may be required to pay to testator's said sister the

income derived from her estate in his custody, not exceeding $10,000 per annum.

I am, therefore, of the opinion that the Alien Property Custodian is entitled to receive the undistributed accrued income on said estate, amounting to the sum of $7,402.11, for which the trustees have accounted. It follows that the decree of the surrogate should be modified so as to provide for the payment to the Alien Property Custodian of the entire income from the trust fund during the accounting period, and as so modified the decree should be affirmed, with costs to the Alien Property Custodian, appellant, respondent, payable out of the corpus of the trust estate.

CLARKE, P. J., FINCH, MARTIN and BURR, JJ., concur.

Decree modified as directed in opinion and as so modified affirmed, with costs to the Alien Property Custodian, appellant, respondent, payable out of the corpus of the trust estate. Settle order on notice.